## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JILL THOMPSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 04-2056 (RMU) |
| | : | | |
| v. | : | Document No.: | 8 |
| | : | | |
| BARBARA POPE, *et al*, | : | | |
| | : | | |
| Defendants. | : | | |

### MEMORANDUM OPINION

#### Granting the Defendants' Motion to Dismiss or for Summary Judgment

### I.   INTRODUCTION

Jill Thompson, a foreign service officer with the Bureau of Diplomatic Security ("DS") of the United States Department of State ("Department of State"), brings suit against seven individuals and John Does, all employees at the U.S. Department of State (collectively, "defendants"), alleging that the defendants violated the plaintiff's rights under the Fourth and Fifth Amendments to the U.S. Constitution.  This matter comes before the court on the defendants' motion to dismiss or for summary judgment.  Because Congress has established a comprehensive statutory scheme governing grievance proceedings under the Foreign Service Act, the court declines to extend a damages remedy under *Bivens v. Six Unknown Named Fed. Narcotics Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  For this reason, the court grants the defendants' motion to dismiss.

## II.   BACKGROUND

### A.   Factual Background

The plaintiff alleges as follows.  Jill Thompson, a foreign service officer with DS, began a tour of duty in October 2000 in the Office of Financial Services, Bureau of Financial Management and Policy, and was staffed on a project to deploy the Department of State's new accounting system.  Compl. ¶ 11.  The plaintiff had numerous reservations regarding this accounting system and voiced these concerns in November 2000 to Larry Eisenhart, the Deputy Chief Financial Officer and a defendant in this case.  *Id.* ¶ 12.  In response to the plaintiff's concerns, "Eisenhart severely berated and humiliated Plaintiff and denounced her concerns before those in attendance."  *Id.* ¶ 12.  Additionally, at Eisenhart's request, the plaintiff was removed from the accounting project.  *Id.* ¶ 13.  The plaintiff documented her professional concerns to Eisenhart in a January 2001 memorandum.  *Id.*  The following month, the plaintiff's then-director Ron Miller reassigned her to the Foreign Service National Global Retirement Fund.  Subsequently, "on various occasions from March-May 2001[,] Mr. Eisenhart abused Plaintiff publicly and by telephone for her work on the FSN Global Retirement Fund."  *Id.* ¶ 16.  The plaintiff documented and formally complained about this abusive conduct to Miller, who "concurr[ed] with her complaint" and forwarded it to Grant Green, the Under Secretary of Management.  *Id.* ¶ 17.

Later, two female employees in the plaintiff's office complained to Eisenhart that the plaintiff was engaged in a romantic relationship with her immediate supervisor, Mike Rafalko, and that she was reaping professional benefits from this relationship.  *Id.* ¶ 18.  Responding to these complaints, Eisenhart and William Todd, the Executive Director of the Bureau of Financial

Management Policy, "contacted a number of offices within the State Department . . . in an attempt to have an investigation launched of Plaintiff's alleged misconduct." *Id.* ¶ 19.  During the course of this investigation, Todd and a subordinate of Eisenhart conducted an initial investigation into Thompson and Rafalko's alleged relationship.  Pl.'s Opp'n to Defs.' Mot. to Dismiss or for Summ. J. ("Pl.'s Opp'n") at 4.  In the course of this investigation, Todd searched e-mail messages in the plaintiff's Department of State e-mail account.  *Id.*  Todd also "sought evidence from certain [Office of International Financial Services] employees, and . . . began searching through Mr. Rafalko's desk while he was out of the office."  *Id.*

As a result of the investigation, the plaintiff bore significant stresses, which culminated, ultimately, in the plaintiff suffering "a subarachnoid brain hemorrhage on September 25, 2001, a life threatening event which is usually fatal."  Compl. ¶ 6.  The plaintiff's neurologist believes that "the levels of stress to which she had been subjected and the hostility of her working environment" caused her ailment,  Pl.'s Opp'n at 5, an opinion the plaintiff conveyed in a letter to Under Secretary Green, Compl.  ¶ 23.

The plaintiff's husband requested assistance from Eisenhart and Under Secretary Green in the form of future relief from the "turmoil" to which the plaintiff was the victim.  *Id.* ¶ 21, 22.  The plaintiff notified the Under Secretary of her belief that Eisenhart's call for an investigation was in retaliation for her complaints of Eisenhart's abusive conduct.  *Id.* ¶ 24.  Assistant Secretary Barbara Pope, a defendant in this case, appointed DS to conduct the investigation into the plaintiff's alleged misconduct.  *Id.* ¶ 25.

In October 2001, shortly after the plaintiff was released from the hospital following her hemorrhage, DS commenced its investigation into the plaintiff's allegations of retaliation.  *Id.* ¶

26.  In the course of this investigation, in November 2001, Diplomatic Security agents interrogated the plaintiff.  *Id.* ¶ 27.  This interrogation "lasted for several hours and ran directly counter to the instructions and requirements set forth to the State Department by Plaintiff's neurologist to protect her health."  *Id.*  Also as part of this investigation, investigators allegedly searched e-mail messages from the plaintiff's Department of State e-mail account, *id.* ¶ 30, coerced the plaintiff into responding to questions not relevant to her official duties or the subject matter of the investigation, *id.* ¶ 31, questioned her about personal photographs, and requested medical documentation of the plaintiff's purported inability to participate in investigatory interviews, *id.* ¶ 34.  Diplomatic Security Agent Thomas Scanlon, a defendant in this case, issued a Report of Investigation ("ROI") in December 2001, which Nancy Rolph-O'Donnell, another defendant in this case, reviewed and approved.  *Id.* ¶ 35.  According to the plaintiff, this report was "grossly inaccurate and unfair to Plaintiff in its content and conclusions."  *Id.* ¶ 35.

From this report, the Bureau of Human Resources ("HR") recommended that the plaintiff's employer suspend her for a period of three days.  *Id.* ¶ 36.  This recommendation was withdrawn, however, after the plaintiff refuted its accuracy.  *Id.*

The plaintiff filed an administrative grievance in January 2002, in which the plaintiff complained of the Department of State's "harsh, injurious treatment" of her.[1]  Compl. ¶ 38.  In December 2002, the plaintiff underwent a compulsory urinalysis drug test.  *Id.* ¶ 40.

According to the plaintiff, as a result of the defendants' conduct and the plaintiff's consequent pain, she "suffers from a disability which prevents her from living without assistance

---

[1]     The plaintiff's complaint states that the administrative grievance was filed in January 2001 and amended in February 2001 – dates prior to the alleged misconduct.  The apparent temporal inconsistency leads the court to assume that the 2001 references are in error, and assume that the plaintiff meant 2002.

and from participating in a full range of normal life activities." *Id.* ¶ 42.  Further, the plaintiff

alleges that as a result of the defendants' conduct, "her career in the foreign service has suffered

and her prospects for professional advancements have diminished." *Id.*

## B.    Procedural Background

Prior to filing the complaint in this case, the plaintiff filed suit against the Department of

State, alleging that the defendant violated the Privacy Act through its investigation of the alleged

romantic relationship between the plaintiff and her supervisor.  *Thompson v. Dep't of State*, No.

03cv2227, slip. op. at 1 (D.D.C. Sept. 26, 2005) (Huvelle, J.).  In that case, the plaintiff made the

precise allegations presented in the case now before this court,[2] yet sued the Department of State

directly, rather than the participating bureaucrats, and alleged that the defendant's actions

violated the Privacy Act, rather than the Constitution.  The court granted summary judgment to

the defendant as to each of the plaintiff's claims, ruling that as to each, the plaintiff failed to

demonstrate any Privacy Act violation.  *See Id.*

Having lost in the lawsuit against the Department of State, the plaintiff has now filed suit

against seven former or current employees of the Department of State, and has sued an

undisclosed number of "John Does."  Comp. ¶ 1.  The plaintiff asserts that she is entitled to sue

the defendants directly for alleged constitutional violations under *Bivens*.  Pl.'s Opp'n.  The

---

[2]     Curiously, however, though the plaintiff refers to the same alleged instances of
misconduct in her complaint, the two, when read together, create inconsistencies.  For
example, in the plaintiff's complaint before Judge Huvelle, the plaintiff states that "[i]n
February and March 2001 two female employees in Plaintiff's office began complaining
to senior management . . . about her alleged relationship with her immediate supervisor."
*Thompson v. Pope*, No. 03cv2227, Compl. ¶ 9.  Yet in the plaintiff's complaint in this
case, the two female employees began their complaining "in April-June 2001."  Compl.
¶ 18.

defendants filed a motion to dismiss, arguing that they are entitled to qualified immunity.  Defs.'
Mot. to Dismiss or for Summ. J. ("Def.'s Mot.") at 8.  Alternatively, the defendants argue that a
*Bivens* remedy is inappropriate in this case because the Foreign Service Act ("FSA") provides a
remedial scheme for the plaintiff's grievances.  *Id.* at 28.  The court now turns to the defendants'
motion.


### III.   ANALYSIS

#### A.   Legal Standard for Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint.  *Browning v.
Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain
statement of the claim, giving the defendant fair notice of the claim and the grounds upon which
it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing
FED R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice
pleading is made possible by the liberal opportunity for discovery and the other pre-trial
procedures established by the Rules to disclose more precisely the basis of both claim and
defense to define more narrowly the disputed facts and issues."  *Conley*, 355 U.S. at 47-48
(internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his
prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or
"plead law or match facts to every element of a legal theory."  *Krieger v. Fadely*, 211 F.3d 134,
136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a
complaint for failure to state a claim unless the defendant can show beyond doubt that the
plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Warren*

*v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040.  Thus,

in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations –

including mixed questions of law and fact – as true and draw all reasonable inferences therefrom

in the plaintiff's favor.  *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy

Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003);

*Browning*, 292 F.3d at 242.  While many well-pleaded complaints are conclusory, the court need

not accept as true inferences unsupported by facts set out in the complaint or legal conclusions

cast as factual allegations.  *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

### B.    The Plaintiff is not Entitled to a *Bivens* Damages Remedy

The plaintiff asserts that under *Bivens*, she is entitled to an implied cause of action for the

defendants' alleged constitutional violations.  According to the defendants, however, an implied

cause of action under *Bivens* is inappropriate in this context because the FSA, applicable in the

given case, provides the plaintiff with a grievance procedure.  Def.'s Mot. at 30.  In addressing

the plaintiff's claim, the court must first survey *Bivens* and its progeny.

### 1.    *Bivens* Implied Causes of Action

A plaintiff may bring a civil action for money damages against a federal official in his or

her individual capacity, acting under color of their authority, for a violation of the plaintiff's

constitutional rights.  *Bivens*, 403 U.S. at 389 (recognizing the judicial authority to create an

implied cause of action against federal officials alleged to have violated the constitutional rights

of a citizen).  The plaintiff's right to bring a civil action is grounded in 28 U.S.C. § 1331, which

provides that the federal courts have jurisdiction over cases "aris[ing] under the Constitution,

laws, or treaties of the United States."  28 U.S.C. § 1331.

Under *Bivens*, the federal courts are free to create *Bivens* remedies absent two distinct

circumstances.  First, no *Bivens* remedies are appropriate where Congress has expressly precluded judicially created remedies either by itself creating a remedy, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 62 (2001) (stating that "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability") (citing *Schweiker v. Chilicky,* 487 U.S. 412, 425-427 (1988)), or by "expressly preclud[ing] the creation of such a remedy by declaring that existing statutes provide the exclusive mode of redress,"[3]  *Bush v. Lucas*, 462 U.S. at 373.  Second, the court will not create a *Bivens* remedy when "special factors counsel[] hesitation in the absence of affirmative action by Congress."[4]  *Bivens*, 403 U.S. at 395-396.

In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court "recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment" in an instance where the plaintiff "lacked any other remedy for the alleged constitutional depravation."  *Malesko*, 534 U.S. at 67.  Also, in *Carlson v. Green,* 446 U.S. 228 (1980), the Court "inferred a right of action against individual prison officials where the plaintiff's only alternative was a Federal Tort Claims Act (FTCA) claim against the United States."  *Malesko*, 534 U.S. at 68.

Following the decisions in *Passman* and *Carlson*, however, the Supreme Court has

---

[3]     Put somewhat differently, the court defers to congressional action in instances in which Congress has acted,   *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 62 (2001) , and instances in which Congress has spoken, *Bush v. Lucas*, 462 U.S. 367, 373 (1983).

[4]     Following the Supreme Court's decision in *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), a case relied on by the *Bivens* Court, the Supreme Court has "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one." In *Schweiker v. Chilicky,* for example, the Supreme Court "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional depravation in federal court."  *Malesko*, 534 U.S. at 69 (citing *Schweiker v. Chilicky,* 487 U.S. 412, 425 (1988)).  In *Schweiker*, "it did not matter . . . that '[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed.'" *Id.*, (quoting *Schweiker*, 487 U.S. at 425).

"consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Id.*, 534 U.S. at 68.  Chief among these instances, for the purpose of the current discussion, is *Bush v. Lucas*, 462 U.S. 367 (1983).

The plaintiff in *Bush* was an aerospace engineer employed at the George C. Marshall Space Flight Center, a government facility operated by the National Aeronautics and Space Administration ("NASA").  The plaintiff claimed to have been demoted after making statements to the media about NASA.  *Bush*, 462 U.S. at 369-370.   According to an agency finding, the plaintiff's statements had "no basis in fact" and "evidenc[ed] a malicious attitude towards Management and generat[ed] an environment of sensationalism demeaning to the Government, [NASA] and the personnel of the George C. Marshall Space Flight Center, thereby impeding Government efficiency and economy[.]"  *Bush*, 462 U.S. at 369-370.  While an appeal of this agency decision was pending with the Federal Employee Appeals Authority, the plaintiff filed suit against the director of the Space Flight Center for damages for defamation and violation of his first amendment rights.  *Id.*, 462 U.S. at 371.

The Supreme Court recognized that "Congress has not resolved the question presented by this case by expressly denying petitioner the judicial remedy he seeks or by providing him with an equally effective substitute." *Id.,* 462 U.S. at 379.  Thus, under *Bivens*, the Court was left to determine whether a "special factor" exists which "counsel[s] hesitation" in creating a new damages remedy.  *Id.* (quoting *Bivens*, 403 U.S. at 396).  The Supreme Court held that under the detailed regulations promulgated by the Civil Service Commission, "Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures – administrative and judicial – by

9

which improper action may be redressed."[5]  *Id.* at 385.

Applying *Bush*, the D.C. Circuit ruled that federal employees are not entitled to *Bivens* remedies for constitutional challenges to minor personnel actions governed by the Civil Service Reform Act ("CSRA").  *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988).  The court stated that

> courts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies.  In these circumstances, it is not for the judiciary to question whether Congress' response [was] the best response, [for] Congress is the body charged with making the inevitable compromises required in the design of a massive and complex . . . program.

*Id.* at 228.  Additionally, in determining whether a particular plaintiff is entitled to a *Bivens* damages remedy, the D.C. Circuit stated that a court need not conduct a "case-by-case examination of the particular administrative remedies available to a given plaintiff."  *Id.* (holding that "the preclusive effect of *Bush* extends even to those claimants within the system for whom the CSRA provides 'no remedy whatsoever'") (quoting *Bush*, 462 U.S. at 385, n. 28). Illuminated by the development of *Bivens* remedies by the Supreme Court and the D.C. Circuit, the court turns to the plaintiff's claims.

## 2.  The FSA Constitutes an Elaborate, Comprehensive Scheme

The plaintiff in this case brings suit alleging constitutional violations by various officials at the Department of State.  Unlike *Bush* and *Spagnola*, the plaintiff's employment does not fall

---

[5]  The Court noted the extensive procedural and substantive protections afforded federal civil servants under the Veterans Preference Act of 1944, 58 Stat. 390, the Back Pay Act of 1948, 62 Stat. 354, the Back Pay Act of 1966, 81 Stat. 203, and the Civil Service Reform Act of 1978, 92 Stat. 1134.

under the rubric of the CSRA, but rather, the FSA.  Consequently, the question for this court is whether the FSA provides an "elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures – administrative and judicial – by which improper action may be redressed." *Bush*, 462 U.S. at 385.

Like the CSRA, the FSA provides fundamental grievance procedures.  The CSRA "require[s] that an employee be given 30 days written notice of a proposed discharge, suspension, or demotion, accompanied by the agency's reasons and a copy of the charges." *See Bush*, 462 U.S. at 386.  Likewise, the FSA provides that a member of the foreign service "may not be separated from the Service until the member receives a hearing before the Foreign Service Grievance Board and the Board decides that cause for separation has been established, unless the member waives, in writing, the right to such a hearing, or the member's appointment has expired, whichever is sooner."  22 U.S.C. § 4410(2)(A).  Like a civil servant's ability to "examine all disclosable material that formed the basis of the proposed action," under the CSRA, *Bush*, 462 U.S. at 386, the FSA provides:

> Each party . . . shall be entitled to examine and cross-examine witnesses at the hearing or by deposition and to serve interrogatories upon another party and have such interrogatories answered by the other party unless the Board finds such interrogatory irrelevant, immaterial, or unduly repetitive.  Upon . . . a request of the grievant deemed relevant and material by the Board, an agency shall promptly make available at the hearing or by deposition any witness under its control, supervision, or responsibility, except that if the Board determines that the presence of such witness at the hearing is required for just resolution of the grievance, then the witness shall be made available at the hearing, with necessary costs and travel expenses paid by the Department.

22 U.S.C. § 4136(3).  The statute continues, stating that "the Board shall afford to each party the opportunity to review and to supplement, by written submissions, the record of proceedings prior to the decision by the Board.  *Id.*  The decision of the Board shall be based exclusively on the

record of proceedings." 22 U.S.C. § 4136(6).  Although the CSRA provides a right to appeal, *Bush*, 462 U.S. at 387, the FSA does not,  22 U.S.C. § 4137(c) (stating that "decisions of the Board . . . shall be final").  But, like the CSRA, the final agency decisions under the FSA are subject to judicial review.  22 U.S.C. § 4140.

Substantively, the FSA provides a party with the ability to file a broad range of grievances.  Under the FSA, a grievance is defined as "any act, omission, or condition subject to the control of the Secretary which is alleged to deprive a member of the Service . . . of a right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member[.]" 22 U.S.C. § 4131(a)(1).  This provision is a great deal broader than the CSRA, which the Supreme Court characterized  as "comprehensive." *Bush*, 462 U.S. at 388.

Given the extent of the grievance procedures, as well as the substantive breadth of the grievances permitted under the FSA, it is no wonder that the D.C. Circuit recognized the FSA as "'a comprehensive system of reviewing personnel action[s] taken against federal employees.'" *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (analyzing the FSA in a suit alleging an Equal Protection violation) (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988) (modification in original).  Thus, the court rules that the FSA provides a "comprehensive scheme" which precludes the creation of a *Bivens* remedy. *Polsdorfer v. Gearan*, 1996 WL 451051 (D.D.C. August 1, 1996) (relying on *Krc*, and holding that the FSA precludes a judicially created *Bivens* action) (unpublished decision); *See Bush*, 462 U.S. at 385.

The comprehensive nature of the FSA's grievance procedures provides the plaintiff with "an avenue for some redress [which] forclose[s] judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 62.  What's more, Congress stated that the "'Foreign Service Act

12

is intended to be a companion measure' to the CSRA." *Krc*, 989 F.2d at 1217 (citing Senate

Report No. 96-913). Thus, Congress has "expressly precluded the creation of such a remedy by

declaring that existing statutes provide the exclusive mode of redress." *Bush*, 462 U.S. at 373.

Though the court need not pay great heed to whether this plaintiff is covered by the

protections of the FSA, *Spagnola*, 859 F.2d at 228, the plaintiff invoked the grievance procedures

of the FSA, thus demonstrating the availability of this process to this plaintiff. Compl. ¶ 4(f).

Although the Foreign Service Grievance Board denied the plaintiff's grievance, the plaintiff was

entitled to seek judicial review of that decision pursuant to 22 U.S.C. § 4140. The plaintiff's

own decision not to seek judicial review of the Foreign Service Grievance Board's decision,

where Congress has provided a judicial review process, does not constitute a sufficient

justification for this court to create a *Bivens* remedy.

The plaintiff argues that her claims are not covered by the FSA grievance procedures

because the grievance procedures are limited to "any act, omission, or condition subject to the

control of the Secretary which is alleged to deprive a member of the Service . . . of a right or

benefit authorized by law or regulation." Pl.'s Opp'n at 37. The court need not engage the

plaintiff's statutory construction argument for a fundamental reason – "it is the

comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies

extended thereunder, that counsels judicial abstention." *Spagnola*, 859 F.2d at 227. In this

instance, having concluded that Congress has set forth a comprehensive scheme in the FSA, the

court need not proceed further.

## IV.  CONCLUSION

For all the foregoing reasons, the court grants the defendants' motion to dismiss. An

order directing the parties in a manner consistent with this Memorandum Opinion is separately

and contemporaneously issued this ___ day of November, 2005.


RICARDO M. URBINA
United States District Judge